———o-o-o———

## The American Transportation Company vs. Franklin Moore and Others.

Whether, in a particular case, a merchant in New York, shipping goods to his correspondent in the interior, had authority to make a contract on behalf of the correspondent for shipment, on different terms from those ordinarily adopted by common carriers, is a question of fact, to be determined by the jury, upon the evidence; and the Court can not, properly, be asked to make any charge that shall absolutely dispose of the fact in controversy.

Although it devolves upon a common carrier to show affirmatively the terms of any contract which lessens his common law liability, yet that fact is to be proved, like any other, by any pertinent evidence. If in writing, the writing must be shown; but, if by parol, there is no rule which requires different proof from that which would establish any other contract. The jury must be satisfied, from the evidence, that a certain contract exists; and, if satisfied, that is sufficient.

Where the Court is asked to, and does, charge the jury as to the conclusive nature of a written contract between the parties, if they shall find such contract established by the evidence, and there is no proof in the case showing, or tending to show, a written contract of the kind mentioned in the charge, such charge is improper, as tending to mislead the jury.

The navigation of the great American lakes, and their connecting waters, is not "Inland Navigation," within the meaning of the Act of Congress, entitled, "An Act to Limit the Liability of Ship-owners, and for other purposes," approved March 3d, 1851. And, therefore, where goods were entrusted to a common carrier, to be transported from New York to Detroit, by way of Lake Erie and the Detroit River, and while upon the steamboat of the carrier, in the harbor of Buffalo, in the course of transit, were destroyed by fire, without any negligence or fault on the part of the carrier or his agents, the carrier is not liable to the owner for the loss.

*Heard May 28th and 29th, and June 1st and 2d.  Decided July 14th.*

Error to Wayne Circuit.

The plaintiff in error was sued by the defendants in error, in an action of assumpsit, for the non-delivery of certain goods entrusted to the plaintiff in error, in New York, to be

transported to the defendants in error, in Detroit, by way of Buffalo and Lake Erie.

The evidence shows the following facts:

The plaintiff in error was a common carrier, having its business office in New York, and engaged in transporting goods for hire from New York to the western cities, by way of Hudson River, the Erie Canal, and the Lakes. Prior to shipping any goods, Mr. Foote, one of the defendants in error, called at the office of the plaintiff in error, in New York, to ascertain the terms upon which he could get his goods transported, and had an interview with one Caldwell, an agent of the Company. Caldwell, in reply to Foote's inquiry, filled out a blank printed form of contract used by the Company, and exhibited it to Foote, as containing the terms upon which the Company would transport his goods. This contract bound the Company to carry all goods offered, and fixed the rate of transportation at 40 cents per 100 lb. for heavy goods, and 45 cents per 100 lb. for light goods, to the end of the season, "subject to any advance of lake freights" after a certain date; and the shipper bound himself to deliver all goods he would have for transportation to the end of the season; and, in consideration that the rates of freight therein fixed were one dollar per ton less than was charged in the absence of such special contract, the shipper agreed to exempt the Company from loss and damage 'to all goods insured, dangers of navigation on the lakes and rivers, *damage by collision and fires,* &c.

Foote examined the paper, and objected to the clause providing for an advance of lake freights, and also to the classification of "nuts" as *light* goods: Caldwell consented to amend the contract in those particulars. Foote then objected to those clauses which exempted the Company from liability for loss, &c., by the dangers of lake navigation, by collision and fires, and on goods insured. Caldwell declined to alter the contract in those respects; explained their object to Foote, and told him that the Company "would not make

any variation from the printed form of contract, except in the two matters already stated"; and Caldwell testified that he never agreed to waive any other provision, or gave Foote to understand that he would. Foote refused to sign the contract, but informed Caldwell that he would ship some of his goods by the Company's line, and then Caldwell agreed to carry what goods he should ship, at the same rates (40 and 45 cents), subject to no advance of lake freights, and classing nuts as heavy. Caldwell, at Foote's request, gave a written memorandum to that effect; which memorandum, Caldwell testifies, "had reference to the rate of freight, and nothing else." Afterwards, Foote directed the merchants of whom he bought his goods, to forward them by the Company's lines, and they did so.

On the delivery of the goods by the respective merchants to the Company's agent, for shipment, receipts, or bills of lading, were given for different portions of the goods, in two different forms: The first form was a simple receipt, acknowledging the delivery of the goods, by the merchants, in good order, and setting forth the mark and destination, viz., to the plaintiffs below, at Detroit. These receipts were not signed by the Company's agent, but stamped with the words "Receipt given at 64 Pearl-st.," which was the business office of the Company; and no application was ever made at that office for any other receipt or bill of lading. For all the other goods similar stamped receipts were given, but those papers were taken by the respective shippers, to the office, and there exchanged for receipts, or, more properly, bills of lading, in the following form: They acknowledged the receipt of the goods from the merchants, in good order, "to be forwarded to the lake port of Detroit, *the loss or damage* from the dangers of lake and river navigation, collision and *fire, at the risk of the owner of the goods.*"

It was admitted, on the trial, that these goods, while in the course of transit to Detroit, were shipped on board the steamboat M. B. Spaulding, one of the Company's boats, at

Buffalo, to be carried by way of Lake Erie and Detroit River, to Detroit; that, while lying in the port of Buffalo, a fire broke out on board the steamboat, which destroyed the boat itself and all these goods, and that the fire arose from some unknown cause (probably spontaneous combustion), *without any negligence or fault on the part of the Company or its agents.*

The defendant's counsel asked the Court to instruct the jury as follows:

1. If the jury shall believe that Foote and Caldwell made a special contract, yet, if the merchants who shipped the goods afterwards accepted bills of lading varying that contract, such subsequent action binds the plaintiffs, and is a new contract by the plaintiffs' agents.

2. That if the jury believe, from the evidence, that the plaintiffs directed the merchants in New York, of whom they bought the goods, to forward them by the defendant's line, and the merchants did so, and, on delivery of the goods to defendant's agent, accepted bills of lading, or shipping receipts, therefor, containing a clause exempting the defendant from risks of fire, then their acceptance binds the plaintiffs, and the plaintiffs can not recover for any goods included in such bills of lading, or receipts.

3. If the jury believe, from the evidence, that in the contract between Caldwell and Foote, no positive provision was made as to risks, and that the contract was silent on that point, then the subsequent delivery, on the receipt of the goods, of bills of lading, or shipping receipts, containing a clause exempting the defendant from the risk of fire, and the acceptance of such receipts, or bills of lading, by the merchants who sold and shipped the goods to plaintiffs, was a contract binding upon the plaintiffs.

4. That if the jury believe, from the evidence, that the plaintiffs' goods were on board the propeller M. B. Spaulding, and were destroyed by means of a fire happening on board said vessel, without any default of the defendant, and that

the propeller was owned by the defendant, and was used principally in navigating between the cities of Buffalo and Detroit, by the way of Lake Erie, then such propeller was not used in river or inland navigation, and the defendant is exempted from liability for said goods, by virtue of the provisions of the first clause of the first section of the Act of Congress, approved March 3d, 1851, entitled "An Act to Limit the Liability of Ship-owners, and for other purposes."

Which instructions the Court refused to give; to which refusal the defendant excepted.

Thereupon, the plaintiffs requested the Court to instruct the jury, as follows:

1. The general liability of the carrier, independent of any special agreement, renders him chargeable as an insurer of the goods, and accountable for any loss or damage that may happen to them in the course of the conveyance, unless arising from the act of God or the public enemy.

2. The burden of proof lies on the carrier; and nothing short of an express stipulation, by parol or in writing, will discharge him from the duties the law imposes. The exemption from these duties can not depend upon any implication or inference founded on doubtful and conflicting evidence, but must be specific and certain, leaving no room for controversy between the parties.

3. That if the jury find that the contract between the parties was reduced to writing, and is embodied in the entry on the card and the entry on the defendant's books, then that the conversation of the parties in relation thereto, preceding the making of the contract and at the time thereof, can not be received to contradict or to vary the same.

4. That Act of Congress of 1851 has no applicability to the case, inasmuch as the "Spaulding" was engaged in inland navigation.

5. That the rule of damages is the value of the goods at the place of destination.

The Circuit Judge charged substantially as requested by

plaintiffs; and the defendant having excepted to the charge, the case, after verdict and judgment for plaintiffs for the value of the goods, was brought to this Court by writ of error accompanied by bill of exceptions.

*Towle, Hunt & Newberry*, for plaintiff in error:

The navigation of Lake Erie is not "inland navigation" within the meaning of the Act of Congress.— 1 *Conkling's Admiralty*, 209 to 213.

The word "inland" being ambiguous, the intention of Congress, if it can be discovered, is to govern.— *Sedgw. Const. & Stat. L.* 231. We contend that the word means *within the limits of the United States* — not inland as regards the American continent, but as regards our own country. Congress is legislating for the United States, and may be deemed to have had in view our own country, and that alone. If Congress were legislating for the whole continent, or if the word were found in a treaty, or in the Law of Nations, the case would be different.

This statute was taken from British statutes on the same subject.— 26 *Geo. III. Chap.* 86; 53 *Geo. III. Chap.* 159. A similar phrase in the latter of these, beyond question refers to navigation wholly within England. It does not embrace the Straits of Dover, though these, as regards the continent, are quite as much inland as Lake Erie.

Congress could not have meant, by the term "inland," ocean or tide-water navigation. But Long Island Sound, the bays and sounds on the Atlantic coast, and even the Gulf of Mexico, may be called "inland."

All the reasons and motives which could operate to induce Congress thus to exempt ships at sea, would apply with equal force to the lakes. The number of vessels employed, the amount of property and life at stake, and the risks of navigation, are all quite as great.

The Acts of Congress invariably speak of these lakes as the "frontier," the trade on them as the "foreign and coast-

ing trade," and the trade with the British Provinces as the "import," "export," and "foreign" trade. The words "frontier," "coast," and the like, imply waters *outside of the land*, and are the very antitheses of "inland."

It is to be presumed that Congress intended this Act to operate over all those waters to which its power under the Federal Constitution could extend. That power extends to all waters within admiralty and maritime jurisdiction. Congress has declared the lakes to be within that jurisdiction (5 *Stat. at Large*, 726), and by several other statutes has assumed a national jurisdiction over these waters. — 9 *Stat. at Large*, 73; *Ibid.* 382; *Genesee Chief vs. Fitzhugh*, 12 *How.* 450. But waters to which admiralty and maritime jurisdiction attaches, are those which are *external* — upon which a foreign trade is carried on.

The wording of the statute will throw light upon this question. Within the rules of construction (*Dwarris on Stat.* 704; *Broom's Legal Maxims*, 276, 295), the word "inland" in the phrase "river and inland navigation" can not have a broader signification than "river"; it must be presumed that Congress intended by it an inferior grade — as canals, or the like. So, in the phrase "canal boats, barge, or lighter, or to any vessel of any description whatsoever," the sweeping clause used must be taken to mean vessels of an inferior degree and of a like kind.

The title to the Act would imply that it was intended to include all large vessels. The words "ship or vessel" are used all through the Act. *Ship* means a vessel of the largest class; and the phrase, within the rule referred to, means "a large vessel or a smaller one." But in the proviso, the words used are "canal boat, &c. or vessel." This difference could not have been unintentional. If it had been intended to exclude from the Act ships or vessels of a large class engaged in river or inland navigation, the words "ship or vessel" would have been retained here. The dropping of these words is very significant. — See *Dwarris on Stat.* 706, 707.

AMERICAN TRANSPÓRTATION CO. *vs.* MOORE.

There are many reasons for believing that Congress intended to give an enlarged and liberal operation to this statute. 1. The rule of law which holds a ship at sea responsible as an insurer against fire, is an extremely harsh and rigid one. The reasons for applying such a rule to carriers by land, do not apply at all.—See *Angell on Car.* § 152. 2. It is very questionable whether the common law rule should be applied to a carrier by sea.—*Jones on Bailments*, 20. Neither by the admiralty law, nor by the civil law, was such carrier responsible for loss by fire.—*Story on Bailments*, §§ 465, 467, 488; *Erskine's Inst.* 592, *Note.* A case never has occurred in England where a ship-owner has been held liable for goods destroyed *by fire at sea;* though it is laid down in general terms, that carriers by sea are to be held liable as common carriers. And the passage of the English Acts, exempting them from liability, shows how the public mind revolted at such a rule.

This rule was first established by judicial decisions in this country, and so late as 1843.—*Hale vs. N. J. Steam Nav. Co.* 15 *Conn.* 539; *N. J. Steam Nav. Co. vs. Merchants' Bank*, 6 *How.* 344. Here are the only cases on the subject; and the last was finally decided upon the ground of gross negligence. It is believed that the Act in question was passed in consequence of this decision.

The rule referred to, when applied to carriers by sea, is harsh and cruel in the extreme, and impolitic. The carrier's own life and property are staked upon his faithfulness and care, and are a sufficient guaranty. And these remarks apply to lake navigation with equal force as to that of the sea.

*Geo. B. Hibbard* (of Buffalo), on same side:

1. The Act in question should be construed with reference to the history of previous legislation on the subject, the object in view, and the geographical divisions of the country, of which the Court is bound to take judicial notice.—1 *Kent Com.* 462, 460; *Jackson vs. Collins*, 3 *Cow.* 89; *Ton-*

*nele vs. Hall*, 4 *Comst.* 140; *Fitzhugh vs. Genesee Chief*, 12 *How.* 443; *Murray vs. Baker*, 3 *Wheat*, 541; *Shelby vs. Guy*, 11 *Wheat*, 361; *Bank of Penn. vs. Commonwealth*, 7 *Har. Pa.* 144; *Southwark Bank vs. Commonwealth*, 26 *Pa.* 446; *Aldrich vs. Williams*, 3 *How.* 9, 24.

2. The history of such legislation, the evident object of the Act, show that it was the intent of Congress not to exclude from its operation vessels employed in navigation like that of the vessel in question; and that the navigation of the great western lakes by vessels enrolled and licensed for the coasting trade is not "inland navigation.— *Preamble Statute, 7 Geo. II., cited in Abbott on Ship.* 394, 395; *Act, 53 Geo. III., cited in Abbott on Ship.* 399; *Act, 26 Geo. III., cited in Abbott on Ship.* 389; 17 *and* 18 *Victoria*, 190, *Part IX.,* §§ 502, 503; *The Rebecca, Ware*, 188; *Pope vs. Nickerson*, 3 *Story C. C.* 465; *Murray vs. Baker*, 3 *Wheat.* 541; *Shelby vs. Guy*, 11 *Wheat.* 361; *Story on Bills*, §§ 22, 23; *Conkling Admiralty*, 57; *U. S. vs. Grush*, 5 *Mason C. C.* 290, 298, 300; *DeLovio vs. Boit*, 2 *Gallison*, 398; *The Schooner Harriet*, 1 *Story C. C.* 251, 259; *Rees' Encyclopedia*, "*Inland Navigation*"; *Dunlop's Laws U. S.* 1209; 10 *Stat. at Large*, 61, 62; *Dunlop's Laws U. S.* 256; 8 *Stat. at Large*, 117; *Works Alexander Hamilton, Vol.* 7, *p.* 247; 3 *Kent Com.* 249; *Ordinance of* 1787, 1 *Stat. at Large*, 52; *Edinburgh Review*, Oct. 1857, " *The Mediterranean*"; *Encyclopedia Britannica*, "*The Mediterranean*"; *Adam Smith's Wealth of Nations, Book I. Chap.* 3; *Chitty on Commercial Law*, 88 *to* 102; 1 *Kent Com.* 27, 28; *Opinion Edmund Randolph, Att'y Gen'l U. S.* 1 *Opinions Att'y Gen'l U. S.* 13.

3. Admiralty jurisdiction has been held to extend over the western lakes, under the clause in the Constitution of the United States extending the judicial power to cases of " admiralty jurisdiction." It has been so extended upon judicial recognition by the Supreme Court of the national and commercial character of those waters. The well defined

meaning of the phrase "admiralty jurisdiction" has been no further altered then to include within its significance the western lakes. "Admiralty jurisdiction" has never been held to extend over "inland" waters. As the western lakes are thus, from their national and commercial character, beneath admiralty jurisdiction, they can not be "inland."—*Constitution U. S. Art. III. Sec.* 2; *Fitzhugh vs. Genesee Chief*, 12 *How.* 443; *The Propeller Charles Mears*, 1 *Newberry's Ad.* 197; 1 *Curtis Juris. Courts U. S.* 34; *VanSantvoord's Lives Chief Justices U. S.* 48, 144; *Woolrych Law of Waters*, 62; 1 *Conkling Admiralty*, 209; *Watson vs. Marks*, 2 *Am. Law Reg.* 157.

4. Congress has no power under the Constitution to legislate as to commerce carried on within the bounds of any one State. The words "inland navigation" certainly mean navigation within the jurisdiction of one State. They will not be held also to include that other and greater commerce for which vessels are enrolled, licensed, &c. The object of the provision that the Act shall not apply to cases of "inland navigation," therefore, is expressly to provide that the Act shall not apply where Congress has no power to make it apply. Similar restrictive provisions are commonly contained in statutes.—*Gibbons vs. Ogden*, 9 *Wheat.* 1, 195; *S. B. Co. vs. Livingston*, 3 *Cow.* 713, 755; *S. B. James Morrison*, 1 *Newberry*, 241, 246.

*Walkers & Russell*, for defendants in error:

The propeller was used in a river *and* in inland navigation both; and the Court below correctly interpreted the statute.

The propeller was used in a river, because it plied between Detroit and Buffalo, necessarily navigating the River Detroit. The *popular* signification of words is to be looked at; and the Detroit, though strictly a strait, has always been denominated a river.

But the principal question is, whether navigation upon

the *lakes* is *inland* navigation; and we proceed to suggest several reasons in favor of the proposition that it is.

1st. The word *inland*, in general, is used as the correlative of *ocean* or *tide-water;* and when applied to navigation, as to bills of exchange, signifies *domestic*, as contradistinguished from *foreign*. Navigation upon the Caspian, or the Sea of Aral, although upon salt water, is inland navigation. *Size* can make no difference, and Lake Erie is no less inland than Ladoga, Leman, or Baikal, in Europe, or Champlain or Winnebago, in America. The "Spaulding." ran to no foreign port; if she had, the question would assume a different aspect.

2d. The term inland is applied to the lakes by the most eminent judges and text-writers, when treating of maritime subjects, and in the ordinary use of language; and has been so applied by geographers and historians, from the time of the discovery.— *Genesee Chief*, 12 *How.* 453; *Conkling Adm. new ed. pref. p.* 5, 8, 18, *Note; Merrick vs. Webster*, 3 *Mich.* 275; 1 *Newberry, pref. and p.* 545; *Encyc. Geog. vol.* 3, *p.* 350; *Somerville Phys. Geog.* 266.

3d. The use of the word in the statute is cumulative, and not explanatory of previous terms— "used in rivers *or* inland navigation." There can be but four sorts of navigation,— ocean, river, canal, and lake. Barges and lighters—used in shallow sea-coast harbors, —canal boats—vessels employed in rivers—have all been enumerated; "*or* inland" is then added, *ex industria*, obviously to cover the only remaining species of navigation not already referred to—viz., *lake*.

There is no reason to believe that the operation of the Act was intended to be co-extensive with the United States admiralty jurisdiction, now held to include the lakes.

4. The fact that a national boundary traverses Lake Erie and the Detroit River can make no difference. The same may be said of the River St. Johns, the boundary of Maine and New Brunswick; or of Pigeon River. The application of this test, too, would render necessary the ab-

surdity that Congress intended to apply different rules to lakes Erie and Michigan, as the latter is wholly in the United States; so that a carrier would be exonerated or not, according as his vessel should be burned upon Huron or Michigan.

CAMPBELL J.:

The errors assigned in this case arise upon the action of the Court below, in charging and in refusing to charge.

The requests, made by the defendant below (who is plaintiff in error), numbered one, two, and three, were properly refused by the Court.

Whether the merchants in New York, shipping goods to Moore, Foote & Co., had authority to make contracts for shipment on different terms from those ordinarily adopted by common carriers, was a question of fact; and the Court could not properly be asked to make any charge which should absolutely dispose of a fact in controversy. The whole depended on the terms of agency.

We think the second instruction asked by the plaintiffs below, and given by the Court, is too broad and unqualified, and would naturally tend to mislead a jury. It was taken literally from the opinion of the United States Supreme Court in the case of the *New Jersey Steam Navigation Co. vs. Merchants' Bank*, 6 *How.* 344. But as it appears there, it is considerably qualified by the context. And it was not propounded there as an independent abstract legal proposition, requiring no explanation. While it is true that it devolves upon a carrier to show affirmatively the terms of any contract which lessens his common law liability, yet that fact is to be proved like any other, by any pertinent evidence. If in writing, the writing must be shown; but if by parol, there is no rule which requires different proof from that which would establish any other contract. It does not matter that the evidence is conflicting, for in civil cases the jury must always decide upon the weight of evidence; and there

is no rule (except where turpitude or illegality is in issue) which requires one contract to be proven by more or different testimony than another. The jury, in each case, must be satisfied that a certain contract exists; and, if satisfied, that is sufficient. In *Walker vs. The York & North Midland R. W. Co.* 22 *Eng. L. & Eq.* 315, where a plaintiff had been notified that a Company would not be responsible for certain risks, and objected to the notice, and claimed that it was not binding on him, and subsequently forwarded goods by the line, it was held that it was proper to instruct a jury that they might infer an agreement on the part of the plaintiff to such terms, unless a clear refusal on his part was shown, and also an acquiescence by the Company in such refusal. This case is cited with approbation, and given as an example, in a very able essay on the theory of Implied Contracts, reprinted from the London Law Magazine in 4 *American Law Register*, 321.

We also think the third instruction given was erroneous. The unsigned memorandum was no contract in any sense of the term, and could only be made available as embodied by reference in some written or parol agreement which should adopt it. We think there was nothing in the case to found any such charge upon. There was no evidence showing, or tending to show, a written contract of the kind mentioned in that charge, and the charge was, therefore, improper, as tending to mislead the jury.— *Toulmin vs. Headley*, 2 *C. & K.* 157.

The principal controversy in this case, and one which goes to the entire merits, is that raised by the fourth request of the defendant below, touching the character of lake navigation, within the purview of the Act of Congress entitled "An Act to Limit the Liability of Ship-owners, and for other purposes," approved March 3d, 1851.— 9 *Stat. U. S.* 635. It is claimed by the plaintiff in error that the owners of vessels thus employed are not liable for losses on board by fire occurring without fault or negligence; while the defendants

in error insist that such vessels come within the exceptions to the statute, and are, in the eye of the law, engaged in "inland navigation."

The first section of the Act exempts the owners "of any ship or vessel" from liability for loss or damage to goods shipped, by reason of any fire happening on board without the design or neglect of the owners, with a proviso allowing the parties to make such special contracts as they may see fit. The second section exempts the master and owners from any liability for certain valuable articles, when not made known and entered on the bill of lading truly; and in all cases limits the liability for such goods to the entered valuation. The third section limits the liability of any owner for any occurrence happening without his privity or knowledge, to the value of his interest in the ship and freight. The fourth section provides a method of equitable apportionment, where the value of the ship and freight falls short of the losses. The fifth section makes the charterers owners during the charter, for the purposes of the Act. The sixth section saves all remedies against master and crew. The seventh section contains a penalty for shipping certain inflammable and explosive articles in a general freight ship, without a written note of the articles shipped. The latter clause of that section —which is, in fact, a separate section—is as follows: "*This Act shall not apply to the owner or owners of any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation.*"

The question raised here is one which has never been passed upon by any court of last resort in this country, so far as we have been informed; and its importance demands a very careful examination. We propose, therefore, to view it in the light of the old law, and of the maritime legislation of England, from which the statute in question was substantially, and, in most respects, literally derived.

The policy of England has long been to aid and encourage navigation. But, so far as the liabilities of ship-owners, as

carriers, were concerned, they were left generally to be re-
gulated by the bills of lading. From the earliest times these
have exempted vessels, not only on account of the act of
God or of the public enemy, but from all losses arising from
*perils of the seas*—a broad and comprehensive phrase, cover-
ing most casualties not attributable to negligence of some
kind in the officers or crew. Although, in some early author-
ities, it is clearly intimated that fire is not a peril of the
seas, yet, as no case arose calling for the application of the
doctrine, it seems to have been lost sight of for a long time.
In 1785, the first reported decision occurred, holding inland
carriers liable for loss by fire.—*Forward vs. Pittard*, 1 *T. R.*
86. In 1786, in consequence of that decision, the statute, 26
*Geo. III. Chap.* 86, was passed, whereby the owners of any
ship or vessel were exempted from liability for loss by fire
happening on board of the vessel, and their other liabilities
were limited. This statute exempted no one but the owners
from the particular liability; and it has been customary to
exempt the master or charterers in such cases by the bill of
lading. By the statute, 53 *Geo. III. Chap.* 159, certain other
qualified exemptions were made (not referring, to fire, how-
ever) ; and this last Act was, by its terms, not to extend to
" the owners of any lighter, barge, boat or vessel, of any
burden or description whatsoever, used solely in rivers or
inland navigation, or any ship or vessel not duly registered
according to law." It had been decided already that the
previous Act did not apply to lighters.—*Hunter vs. McGowan*,
1 *Bligh*, 573. It was also intimated in the case of *The
Dundee*, 1 *Hagg.* 113, that foreign vessels were not within
these Acts, which were passed for the benefit of British
commerce. The same principle was affirmed in *The Girolamo*
3 *Hagg.* 187, and *The Carl Johann*, cited in the latter case.
By 6 *and* 7 *Wm. IV. Chap.* 61, the provisions of these
Acts, and of 7 *Geo. II. Chap.* 15 ( which was an earlier
Act, tending in the same direction), were declared to extend
to Ireland. The object of all this legislation is said, in *Gale*

*vs. Laurie*, 5 *B. & C.* 156, to be "to encourage persons to become owners of ships."

Holland had, at an earlier day, passed similar laws for the same purpose. And by the Marine Ordinances of France, Book II., Title IV., Art. 2, it was provided as follows: "The owners of ships shall be answerable for the deeds of the master; but shall be discharged, abandoning their ship and freight"; in this respect conforming entirely to the English statutes and the Act of Congress, in all cases except fire — if, indeed, that is an exception; and such is the general maritime law of Europe.—3 *Kent Com.* 217, 218.

It is worthy of remark, that, while by the English and American statutes, a liability to the extent of his interest in the vessel and freight is retained against the owner in all other cases where there was a common law liability, the exemption against fire is absolute* and entire.    But while collusion might exist in other cases, fire on shipboard could very rarely occur designedly; and, inasmuch as the maritime law requires goods generally to be stowed below deck, the vessel would commonly be destroyed by any fire which destroyed her cargo, while, in other cases, where damage occurs not within the legal exemptions, the vessel may, and usually does, remain undestroyed. There was no liability for fire without negligence, by the civil law.— *Hunt vs. Morris*, 6 *Mart. La.* 676.

It can require but a very slight comparison between our statute of 1851 and the English Acts to ascertain that it was copied from them. The general tenor is the same, and our law is referred to this origin by Curtis J. in *The Manufacturing Co. vs. Bark Tangier*, *Am. Law. Reg. for June*, 1858, where an action was brought for goods burned. The peculiar term "rivers or inland navigation," which led to some discussion before us in this case, and which Judge Conkling in 1 *Adm. Juris.* 209, supposes to have been a clerical mistake, is adopted literally from the Act of 53 *Geo. III.*, above referred to.    So far, therefore, as English

authorities bear upon the subject under consideration, they are worthy of attention. The same craft specifically exempted under 53 *Geo. III.*, are exempted by name in our statute, which contains no more extensive designation of particular vessels. Some of the English Pilot and River Acts, containing similar designations, have passed under the observation of the courts, and may also be examined with profit.

It is quite evident from the tenor of the English legislation that the intent of the Acts referred to was to strengthen their commercial marine, by encouraging persons to invest their capital without the risk of ruin from those casualties which no ordinary care on their part could prevent. Every owner could not be a master or mariner, and self-interest would always prompt ship-owners to select reliable officers and crews. There was great injustice in holding the innocent owner for matters entirely beyond his control. While, therefore, the master was still left, in most cases, liable as at common law, the owner was made exempt. But the reasons which made such a relaxation necessary or expedient in the case of vessels engaged in maritime commerce, did not apply with so much force to the excepted list. The classes named in the exception are all small vessels of burden, incapable from their nature of withstanding the perils of the sea, and never in fact exposed to them. They are not required to be navigated by expert seamen, and are never, or but rarely, beyond the reach of their owners, or of succor in peril. It will be found that in the English courts, for these and other reasons, Acts have been repeatedly construed with reference to one class or the other by the character of the service, or the class of vessels designated, where the general terms used in addition would, in the popular sense, or with another context, embrace both classes. The case of *Hunter vs. McGowan*, already referred to, held that the Act of 26 *Geo. III.*, was inapplicable to lighters, although the terms used were "any ship or vessel." But, not only was the term "ship" the governing phrase, from

which a fair intent might be drawn that "vessel" meant something of kindred employment, but the Act referring to bills of lading, masters, mariners, and shippers, and providing for an apportionment of loss in certain cases in a court of equity, the inference would be almost irresistible that it had reference to maritime business, because all the phrases are maritime. The original report of this case is not at our command, but it is frequently cited, and evidently went upon this ground. In *Blanford vs. Morrison*, 15 *Q. B.* 724, under an Act which required a certain ticket or certificate for all coal delivered in London "*by any lighter, vessel, barge or other craft*," it was held that a coal-brig, which brought coal coastwise from Newcastle, and delivered it at the wharf, was exempt from the penalty of the law, which was held merely to apply to such vessels as were used to unload coal from others for delivery, and did not apply to vessels in which it was originally shipped. The discussion is quite full and instructive. In *Benyon vs. Creswell*, 12 *Q. B.* 899, it was held that a vessel under fifteen tons burden could not be registered, and that the registry was void. It had been registered; and the law required every transfer of property in a registered ship or vessel to be by a bill of sale reciting the registry. No ship was by law to be deemed a British ship without registry, but British built boats and vessels under fifteen tons, owned and navigated by British subjects, were to be admitted to be British in all navigation "in the rivers and upon the coasts of the United Kingdom." The Court held that no vessel under fifteen tons could be registered at all. In *Regina vs. Reed*, 28 *Eng. L. & Eq.* 133, it was decided that an Act forbidding any person, not a freeman, to "act as a waterman or lighterman, or navigate upon the river Thames between Windsor and Gantlet Creek, any wherry, lighter or other craft," did not extend to a steam-tug; although by *Tisdale vs. Combe*, 7 *Ad. & E.* 788, Acts with a different wording, had been made applicable to passenger and freight river-steamers on the Thames. The case of *Reed vs. Ingham*,

26 *Eng. L. & Eq.* 164, holds the same doctrine with *Regina vs. Reed*, deciding that the general words must be confined to vessels *ejusdem generis* with those named, and that a steam-tug requires different and greater skill to manage it in its occupation, from that required for wherries, lighters, or similar craft.

These cases all tend to show that such statutes, when mentioning expressly certain classes of vessels, and then using general words, intend to apply the latter to vessels *ejusdem generis*, either of build or business, and not to extend the language beyond.

Besides the well understood meaning of "inland navigation" in England, and the natural inference to be drawn from the use of the vessels particularly named under the rules laid down in the cases cited, some light may be derived from the course of the English courts in dealing with kindred maritime questions, not immediately applicable to these statutes, so far as the exceptions are concerned.

In *Battersby vs. Kirk*, 2 *Bing. N. C.* 584, it was held that Ireland was a place *beyond seas*, in regard to the Bristol Dock Acts, as it had previously been decided under the statute of limitations. In *Davison vs. Mekibben*, 6 *Moore*, 387 (*S. C.* 3 *Brod. & B.* 112), it was held that a vessel engaged in general freighting between Belfast and London, and which, at the time the question arose, was proceeding down the Thames from London, on her way to Belfast, with a general cargo, was neither a " coasting vessel " nor " an Irish trader using the navigation of the river Thames as a coaster." The statute of 6 *Geo. IV. Chap.* 107, declared that thereafter all trade by sea from one part of the United Kingdom to another, or from any part of the Isle of Man to another, should be deemed to be coasting trade, in any matter relating to the trade or navigation or revenue of the realm, and all ships while employed therein should be deemed coasting ships. The Customs Act of 8 *and* 9 *Vict. Chap.* 86, § 113, contains the same provision. In *Shepherd vs. Hills*, 32 *Eng. L. & Eq.* 533, it was

held that vessels running between a port in England and the Channel islands were not coasting vessels, because, although subject to Great Britain, they were no part of the realm, and were not within those Acts.   And where a vessel had come from Calcutta to London, and there discharged her cargo, and thence proceeded in ballast to Liverpool, it was held that the voyage from London to Liverpool was not a coasting voyage within the Pilot Acts.   The reason why coasting vessels were exempted from employing pilots, was because the masters, from their frequent voyages, must become familiar with the navigation; and this reason did not exist in favor of an East India ship.— *The Agricola*, 2 *W. Rob.* 10.   And having employed a pilot, the ship-owners were held not liable for a collision happening while he was on board.   In *Gatliffe vs. Bourne*, 4 *Bing. N. C.* 314 (*S. C. Bourne vs. Gatliffe, in Exch. Cham.* 3 *Man. & Gr.* 642), where goods were shipped from Dublin to London, and destroyed by fire after being landed on the wharf, it was admitted in both courts that if the fire had happened on board, the exemption of 26 *Geo. III.* would have applied to save the owners from liability- The cause of action arose several years after the Irish trade had been embraced within the coasting trade.   The only English case reported arising directly under the Act of 26 *Geo. III.* is *Morewood vs. Pollok*, 18 *Eng. L. & Eq.* 341, where goods were burned upon a lighter in the harbor of Mobile, while in transit from the shore to an English vessel.   It was urged that the lighter might be considered as constructively a part of the ship, and that the goods might thus be deemed *on board*.   The Court, however, said "It can not be said that the lighter was a part of the ship at the time.   It belonged to other proprietors, and was employed for the particular purpose of loading by the owners of the Barbara.   To bring a case within the Act, the fire must, I think, be *on board the vessel which is the property of the owners*, and that was not so here.   Again, the goods were not on board the ship of which the defendants were the owners."   And

judgment was given for the plaintiffs. This case leaves it somewhat in doubt whether, if the goods had been on board of a lighter or shallop belonging to the ship, they might not have been considered on board within the Act. The case of *Johnson vs. Benson*, 1 *Brod. & B.* 454, inclines that way upon another class of liabilities under a bill of lading. Judge Curtis in *The Manufacturing Co. vs. Bark Tangier*, above referred to, decided, in conformity with *Morewood vs. Pollok* and *Gatliffe vs. Bourne*, that goods burned upon a wharf were not within the Act of Congress.

The whole current of decisions in the English courts tends to show that the maritime business has always been regulated as entirely distinct from any other, and that the immense traffic in the narrow seas has not been allowed to be withdrawn from its proper character as sea-going commerce. So far as the term "inland navigation" is concerned in the English Acts, no serious difficulty could arise upon it. Every harbor in England is within the body of a county, while all waters outside of harbors are parts of the high seas, and under the jurisdiction of the admiralty. Lighters, barges, and canal boats are all inland craft within all the definitions. The writers on English commerce all treat of inland navigation as carried on by small or light boats, and confined to rivers, canals, and streams strictly land-guarded; and the decisions have invariably coupled together the class of vessels, and their proper employment, with the language of the Acts of Parliament applicable to them. The coasting trade is defined by statute to be a trade by sea, and embraces now, as we have seen, much business that, before the new laws, was actually foreign in legal contemplation. In the United States it is equally regarded as an external sea-going trade, and this not only by Acts of Congress, but by courts; and is classed separately from all internal commerce.—See 2 *Kent Com.* 599, 600; 10 *Johns.* 10, 11; *Hastings vs. Pepper*, 11 *Pick.* 41. See, also, upon this subject, *Web. Dic.* "*Navigation — inland navigation*"; *Rees' Cyc.* "*Inland*

Navigation," " Barge," " Craft "; and also " Lighter," " Barge," " Gabbert," in any marine dictionary.

The legal and popular sense of the term "inland," when applied to navigation and commerce, differs somewhat from the geographical term as applied to bodies of water. Geographers have classed nearly all large bodies of water, except the great oceans, as "inland seas." The Mediterranean, the North Sea, the Gulf of Mexico, and the Baltic, are all included, geographically, within this class.—*Mur. Enc. of Geog.* 188. The Baltic has been, in our day, claimed as *mare clausum* under the Danish authorities, and most nations have acquiesced in their claim of toll for entering it; yet no one would regard its navigation as in any sense inland navigation. The Mediterranean, and even the Adriatic, although geographically inland, are not so commercially. And the old English claim that all the narrow seas were close seas, and subject to British supremacy, never removed them from admiralty jurisdiction, or regarded commerce on them as inland commerce. The high seas commenced at low-water mark, or at the mouths of estuaries and harbors, and nothing was inland that was beyond those lines.

It is very obvious that inasmuch as all harbors (except, perhaps, open roads), are inland, the test of character could not be whether a vessel merely entered inland waters in the course of its business, but must be found in its general use. The object of the law being to build up general maritime commerce, we have to look to that for a criterion. The vessels not embraced by the terms of the Act are all of a class peculiarly adapted to inland carriage. They are boats of burden unsuited to the open waters. Yet it might well happen that large vessels may be employed at times in strictly inland commerce; and, if so, they would undoubtedly be held by their trade. A general rule is necessary, and that rule is easily and simply applied to the ordinary occupation. A vessel running from New York to Boston is a sea-going vessel, although both her *termini* are inland. A harbor

lighter is not a sea-going vessel, although she may, at times, be outside of the harbor. The English courts have found no difficulty in making such applications of the law. Under their Pilot Acts, the questions are of frequent occurrence. The case of *The Agricola*, already referred to, and also the case of *Hunter vs. McGowan*, are of this character. In *Regina vs. Tibble*, 30 *Eng. L. & Eq.* 372, the question whether a vessel came within the Thames River Acts, was made to depend upon her actual and habitual employment, although the term "western barge" sought to be applied to her, did apply, in its popular sense, but not, as the Court held, in its legal meaning. And in the United States District Court for this District, the Act of Congress exempting ferry boats from the requirements applied to general passenger steamers, was construed to exempt boats built and generally used as ferry boats, although temporarily employed on a short trip off from the ferry route, but in business quite similar to ferriage. It was held that the law could not have been intended to require of boats upon short routes, where passengers were on board but a brief time, and needed no extensive accommodations, the same rules which governed steamers which went on longer trips, and where there was need of conveniences and safeguards.— *U. S. vs. The Ottawa*, 1 *Newberry's Adm.* 536. A similar rule was applied to such boats in reference to the registry and enrolling Acts by the United States Court in Missouri.—*U. S. vs. The S. B. James Morrison*, 1 *Newberry's Adm.* 241; *U. S. vs. Steam Ferry Boat William Pope, Ibid.* 256. There can never be any practical difficulty in determining whether a boat is employed in inland navigation, when the character of that navigation has been determined. In *Wallis vs. Chesney*, 4 *Am. Law Reg.* 307, the District Court of Maryland declined jurisdiction of a contract to carry coal on a canal boat, as not a maritime contract, because a large portion of the route was inland on a canal, although forty miles of carriage was on tide-water. And other cases will be referred to under another branch of the inquiry.

When an Act is passed by Congress, modelled upon Acts of Parliament, and containing similar qualifications, 'the. rules which apply to one should have some, if not a controlling force, in construing the other. We have referred to the English statutes from which this law was taken, and we now propose to refer to the commercial legislation and policy of this country, to aid us in determining the legal intendment of our statute. These are safer guides than any individual opinion.

The commerce of the lakes has been regulated by Acts of Congress from the outset of our history. Prior to 1831, navigation upon them was regulated' by the laws applicable on the seaboard; vessels being registered for the foreign, and enrolled and licensed for the coasting trade. In 1831, as the necessities of commerce had increased, provision was made for special enrollments, which would permit vessels to be engaged in either coasting or foreign trade; and no registry was required. This, in no wise altered the navigation laws, otherwise than to favor lake navigation by opening the foreign trade to enrolled vessels.— *U. S. vs. The Margaret Yates*, 22 *Vt.* 665. In 1845, Congress, by statute, extended the jurisdiction of admiralty over the lakes and their connecting waters— a jurisdiction intimated by the United States Supreme Court to have existed without legislation, on account of the character of these waters.—*Fitzhugh vs. Genesee Chief*, 12 *How.* 443. The registry law, passed in 1850 by Congress (9 *U. S. Stat.* 440), requiring transfers of United States' vessels to be recorded in the custom houses, not only applied to lake vessels, but has been held by this Court to exclude State legislation on the subject.—*Robinson vs. Rice*, 3 *Mich.* 235. The steamboat inspection law of 1838, for preventing accidents on the water, was made in express terms to require of lake steamers on the great lakes the same safeguards prescribed on the ocean.— 5 *U. S. Stat.* 305. It is well known that the enactment of this law was procured on account of fatal accidents on Lake Erie. The

steamboat law of 1852 is in terms a mere amendment of the law of 1838. The passenger steamers on the lakes are by that law left on the same footing with ocean steamers; while ferry boats, tug and tow boats, and steamboats under one hundred and fifty tons employed on canals, were exempted entirely from the operation of the statute, and river steamboats of all sizes were partially exempted, being required to have but one life boat. —10 *U. S. Stat.* 62.

In 1851, when the Act to limit the responsibility of ship-owners was passed, the lake commerce had been placed by the prior legislation upon the same footing with that of the ocean. It had been recognized as subject to the same dangers and partaking of the same character. The loss of the Lexington by fire, on Long Island Sound, and the decision of the Supreme Court on the liability of her owners, in 6 *How.* 344, were the immediate occasion of its passage. The peculiar interior position of the Sound had, as early as 1795, caused a special enactment to be passed, exempting vessels crossing from Long Island to Rhode Island from the rules applying to vessels trading between districts not adjoining— a provision similar to that which, in 1831, relieved lake commerce from the like difficulties. We might well suppose that a law drawn up under such circumstances to exonerate ship-owners would not stop short of providing for all cases of the same character. After the broad legislation regulating our lake trade, and considering its true character, which had certainly become somewhat prominent, we can not be warranted in holding that a statute applying or meant to apply to the protected waters of the Sound, is inapplicable to the more exposed navigation of the lakes, on the ground that such navigation is inland, unless such a meaning is very clearly to be derived from the terms of the Act of Congress. Let us, therefore, see whether there is any other, and, if so, what, inland navigation to which the language is applicable.

It is very clear that where commerce is confined ex-

clusively to the territory of a single State, Congress has no control over it.— *Gibbons vs. Ogden*, 9 *Wheat.* 1; *Milner vs. N. J. R. R. Co. Am. Law Reg. Nov.* 1857. The great canals of New York, Ohio, Indiana, Illinois, and Pennsylvania, and much interior river. navigation, come under the head of local and domestic commerce, and may well have been intended in this exception. The business re- ferred to by the District Court of Missouri, in the cases cited, is of the same kind. But we have also several large rivers which are not internal as far as single States are concerned, and yet are inland in the sense of being entirely sheltered by land within the Republic, and capable of being navigated in safety by any description of boats or small craft. We have many large and important har- bors where hundreds of lighters, tugs, barges, and steamers of various sizes are plying constantly in a purely inland service, but subservient to foreign trade, or that between States. We have also in several places canals entirely within single States, which are used to facilitate the pas- sage of rivers which pass through different States, to avoid rapids and furnish means of continuous navigation. Some of these rivers are on the borders of States, and divide them. Others are within single States, but are used in commerce between different States. The Ohio and the Mis- sissippi are boundary streams; the Missouri traverses one State, and bounds others; the Delaware, the Susquehanna, the Potomac, the Tennessee, and Cumberland rivers, and several others, occupy similar positions; while most of the Hudson and the whole of James River, and several other streams, such as the Sacramento and many more, are within single States, and yet open to commerce from tide-water. Upon all of these streams, there is important commerce within the control of Congress, and laws have been made expressly with reference to it. Canal boats have been di- rectly exempted from marine hospital taxes, and from the ordinary fees for registry, enrollment, and license; and they

can not be libelled for wages. This is the case, even when their terminus, and a considerable portion of their passage, are in tide-waters.—*Buckley vs. Brown,* *Brightly Dig. U. S. L.* 305. Their crews are not entitled to marine hospital relief.—*Ibid.* The reason of this is very obvious; for, although within congressional jurisdiction, their employment is not maritime. Boats and lighters without masts, or, if masted, not decked, employed in the harbor of any town or city, are entirely exempted from the Enrollment and License Acts.—1 *U. S. Stat.* 317, 318. It has been held that coal barges on the Monongahela River are not within admiralty jurisdiction.—*Jones vs. Cincinnati Coal Co.* 3 *Am. Law Reg.* 391. The Steamboat Inspection Act does not, as has been stated, apply to tugs, or towing boats, ferry boats, or canal steamers; and requires but a single life-boat on the largest river steamers. And the Act of Congress of 1845, which extended admiralty jurisdiction over the lakes, and straits between them, did not undertake to do so over even our largest rivers. And whether courts have done so or not, the course of legislation has certainly distinguished them. And the decision in the case of *The Genesee Chief* does not, in fact, settle any question of jurisdiction on any waters but the lakes. In *Jones vs. Cincinnati Coal Co.* before cited, Judge Grier denies the applicability of the doctrine to any but enrolled and licensed vessels anywhere, and in referring to that case intimates very plainly that it was not intended to reach river navigation.

When, therefore, after providing that "the owners of any ship or vessel" shall be free from liability on account of fire on board, not occasioned by their design or neglect, the statute provides that "This Act shall not apply to the owners of any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation," we may properly look to the existing legislation on such navigation, to determine the effect of the Act. And when

we find all the vessels named have been exempted from many of the duties and burdens common to other navigation, and when, especially, we find such of them as are propelled by steam exempted wholly or partially from the provisions devised to guard against fire, there is good reason for excluding them from some of the privileges extended by Congress to other vessels. And there is, in the character of the navigation itself, much to distinguish it from lake or ocean service. There is no danger of foreign competition in such trade, unless in a very few frontier places, and not much there. The risks to vessels, with the one exception of fire, are lighter, and when danger occurs, it is with less hazard of entire destruction of the cargo. Danger from storms or wrecks on these sheltered waters is comparatively trifling. The danger from fire is greater, from the light construction of the boats, and the mode of stowage, upon rivers than upon open waters. The opportunities for theft and embezzlement are infinitely greater where a safe landing can be made anywhere, and where stoppages occur every few hours, if not every few miles. Upon the lakes, cargoes are more securely stowed, and are not so easily shifted or robbed. And while the characters and risks of the various kinds of business differ so materially, there is another respect in which lake navigation greatly subserves our national policy. The merchant marine has been fostered in Great Britain and America not only for commercial, but also for naval purposes. The mariners receive a training which enables the nation to man its navy, in war, with competent seamen. In this country, with a small navy, our merchant vessels, as well as seamen, form important elements of strength. Not only on the ocean, but also on the lakes, the same ships have been used effectively for the double purposes of war and peace. Our lake trade employs great numbers of able mariners, fitted for service in any ships, or on any waters. Our river trade is mostly served by landsmen, or boatmen who would rate as such on shipboard. Not only, therefore, have we a large

navigation, either inland or of an inland character, which is subject to congressional regulation, and which may easily satisfy the terms of the Act, but it differs in most, if not in all respects, as much from lake as it does from ocean business, both in its public and in its private character and policy.

But lake navigation is not inland navigation in any sense. The lakes are not within the borders of any State, and, except Lake Michigan, are not within the United States. But their border character alone would not serve to make them maritime, or change the scale of their commerce. It is their intrinsic nature, and not their position alone, which characterizes their commerce; but their position is also important in some views of national jurisdiction. Our courts have long since learned to disregard the exploded notion that there is any radical difference between salt and fresh water commerce. The old rule of the English Admiralty, and its reason, are clearly stated in the sea laws, in a treatise which is appended to 2 *Pet. Adm.:* " In *aqua dulci,* a ship may become a deodand, but in the sea, or in *aqua salsa* being an arm of the sea, though it be in the body of the country, yet there can be no deodand of the ship or any part of it, though anybody be drowned out of it, or otherwise come by their death in the ship, *because on such waters ships and other vessels are subject to such dangers upon the raging waves, in respect of wind and tempest;* and this diversity all our ancient lawyers do agree in."—*p. lxxi.* This reason is a sound one, and does not depend upon the freshness of the water, but in England generally or universally coëxists with it. The perils which are referred to are as characteristic of the lakes as of the ocean. And in *The Genesee Chief Case,* 12 *How.* 443, the Supreme Court, referring to the Act of Congress of 1845, extending the admiralty jurisdiction over the lakes, say (*p.* 453): "If this law, therefore, is constitutional, it must be supported on the ground that the lakes and navigable waters connecting them are within the scope of admiralty and maritime jurisdiction as *known and understood in the United*

*States when the Constitution was adopted.* If the meaning of these terms was now for the first time brought before this Court for consideration, there could, we think, be no hesitation in saying that the lakes and their connecting waters were embraced in them. These lakes are in truth inland seas. Different States border on them on one side, and a foreign nation on the other. A great and growing commerce is carried on upon them between different States and a foreign nation, *which is subject to all the incidents and hazards that attend commerce on the ocean.* Hostile fleets have encountered on them, and prizes been made; *and every reason which existed for the grant of admiralty jurisdiction to the General Government on the Atlantic seas, applies with equal force to the lakes.*" And the Court very forcibly repudiates the supposed distinction between fresh and salt water.

The true distinction between inland navigation and any other, as we think, must be found in its character, as confined to narrow or land-guarded internal waters, contradistinguished from that which is maritime in its nature. This is the only distinction which can be drawn from the English practice, it is the only one which distinguishes the real character of the various trades, and it is the only one which has any real foundation in the risks and exigencies of commerce. Judge Grier, in the case of *Jones vs. Cincinnati Coal Co.*, above cited, uses this language, referring to coal barges (that case arising out of a collision between such vessels): " A remedy *in rem* against such a vessel, either for its contracts or its torts, would not only be worthless but ridiculous; and the application of the maritime law to the cargo, and hands employed to navigate her, would be equally so." " If it was unreasonable to refuse to ships and steamboats on our great lakes and rivers the benefit of the remedies afforded by courts of admiralty, it may be equally so to apply the principles and practice of the maritime law to everything that floats on a fresh water stream. Every mode of remedy and doctrine of the maritime law affecting ships

and mariners, may be justly applied to ships and steamboats, but could have no application whatever to rafts and flatboats."

If that is inland navigation which is carried on upon inland waters in the geographical sense, we shall be led to strange results. These lakes are classed by geographers, as well as courts and mariners, as inland seas, and are not lakes at all in the proper geographical sense, because they have a direct outlet to the ocean. — 1 *Mur. Enc. of Geog.* 188, 201; 3 *Ibid.* 350. Inland seas embrace, according to the classification, the Baltic, North, and Mediterranean seas, the Gulfs of Mexico and St. Lawrence, Hudson's Bay, and all other bodies of water separated from the open ocean, and yet opening into it. The Baltic, indeed, except during the prevalence of west winds, is comparatively fresh, and all its saltness is derived by influx from the ocean. The same remark is applicable, with still greater force, to the Black Sea. The outlets of both are narrow, and controlled by single powers. But the inland waters of Europe are the seat of an extended commerce, and the ocean is but the passage way to reach it. The ports which, geographically, are on inland waters, control the commerce of the world. The Atlantic ports of Europe are comparatively insignificant beside them. And not only is this so, but the whole admiralty law was formed and settled in those waters. The Rhodian law, the tables of Amalfi, and the Consolato del Mare, were the offspring and the guide of Mediterranean commerce, while the laws of Wisbuy and of the Hanse towns were devised for the Baltic. The principles thus adopted, suggested by the early exigencies of a commerce in those inland waters, which was almost insignificant compared with the lake trade, have stood the test of time throughout the whole civilized world, and every admiralty code is founded upon them. A construction which would make lake navigation inland navigation, simply because the lakes are classed by geographers as inland waters, would apply with equal force to those European

waters which were the very cradle of maritime power. And to do so, and yet leave the navigation of Long Island Sound out of such a classification, would be to ignore every principle of commercial usage.

Not only has the lake commerce been put upon a maritime footing by the navigation laws, and by the decisions of courts, but it, in point of fact, is in all respects as much so as that of the Baltic and Mediterranean. The vessels used in its ordinary navigation are not only capable of employment, but are actually employed, in trans-atlantic voyages, while some, at least, of the lake fleet were brought over originally from Europe. For more than thirty years our government has been striving, to secure the free navigation of the St. Lawrence, for the purpose of enabling lake vessels to communicate with the ocean free from the restrictions imposed on them by the British laws. This privilege was claimed as a matter of right by the Executive Department in 1826, and was placed upon the ground that the right to navigate the lakes and the ocean gave a corresponding claim to navigate their connecting waters. Mr. Clay, then Secretary of State, insisted that if the St. Lawrence were regarded as a *strait* connecting navigable seas, as it ought properly to be, there would by less controversy. And he then proceeds thus: "The principle on which the right to navigate straits depends, is, that they are accessorial to those seas which they unite, and the right of navigating which is not exclusive, but common to all nations; *the right to navigate the seas, drawing after it that of passing the straits.* The United States and Great Britain have between them the exclusive right of navigating the lakes. The St. Lawrence connects them with the ocean. The right to navigate both (the lakes and the ocean) includes that of passing from one to the other, through the natural link." — *Corresp. of* 1826, 33 *Niles Reg.* 411, *et seq.* Mr. Wheaton has expressed similar views on the right to navigate straits (*Wheat. Int. Law*, 240, 250), and applied them to the question of the Danish Sound dues — concerning

the right to which our government took the same ground which has been asserted on the St. Lawrence. Both questions are now set at rest by treaty, and our vessels have the right of passage to the ocean unmolested. — 10 *U. S. Stat.* 1091, *Reciprocity Treaty.*

The lake commerce being in fact maritime in its nature, and having been thus recognized as such by all the departments of the Federal Government, and regulated as such by Congress, we can not hesitate so to consider it in construing the Act in question. And being satisfied that the inland navigation mentioned in the Act can not properly comprehend the maritime commerce of the lakes, we are of the opinion that the plaintiff in error is not liable for the property destroyed by fire on board of the propeller "Spaulding," such fire not having been caused by design or negligence; and that the Court below erred in charging the jury that the navigation of the lakes was inland navigation within the meaning of the Act of Congress.

The judgment of the Court below must be reversed, and a new trial granted.

MARTIN Ch. J. and CHRISTIANCY J. concurred.

MANNING J.:

I can not agree in the construction given to the Act of Congress by my brethren.

The words of a statute, when not used in a technical sense, are to be understood in their ordinary and common acceptation. *Inland,* means within land, or remote from the ocean; and *inland navigation,* that which is carried on within a country, on its rivers or other bodies of water, without reference to their magnitude, whether called lakes or seas, if such bodies of water are not so connected with the ocean, in the commerce of the world, as to be considered a part and parcel of the ocean, or highway of nations. Large bodies of water, consisting of a chain of lakes lying hundreds of miles inland,

and hundreds of feet above the level of the ocean, and in no way connected with it, except as their surplus waters are discharged into it through a river that can not be navigated by sea-going vessels its whole extent, it seems to me are to be considered as inland waters, and the navigation of them as inland navigation, in contradistinction to the navigation of the ocean, its estuaries, seas, gulfs, and bays. Our lakes are sometimes called inland seas. Why *seas?* — Because of their magnitude. Why *inland seas?* — Because of their great distance inland from the ocean, and their disconnection with it; because the land, or bed of the lakes lying beneath the water, is the property of a State, or nation, and, as a necessary consequence, the water covering the land, which no other State has a right to navigate without its permission.

It is admitted the words "inland navigation," in their popular sense include the navigation of our lakes, but it is contended that in the Act in question the lakes are excluded, not in terms, but by some supposed policy of the law not disclosed by the Act itself, but to be found somewhere, I suppose, floating in the hitherto unexplored regions of judicial construction. I can not recognize a rule of interpretation that allows the Court, when in search of the policy of a law, to go outside of the Act itself. If Congress has failed, by the Act in question, to indicate the object it had in view, or to use appropriate language to express what it intended, I doubt whether the matter will be much bettered by any attempt of ours to improve the work. The danger attending all such efforts is, they are too apt to be prompted by a secret dissatisfaction with the law itself, because it does not go far enough, and the exploration is entered upon with a view to the collection of materials to amend it with; and in search of these, no assignable limits are fixed within which they are to be taken, and almost anything is pressed into the service in a desperate case, and made to answer the purpose when nothing better can be found.

I also doubt the power of Congress to legislate on the

5 MICH. — 2A.

liability of common carriers within one State; which is an additional reason to what I have just stated for construing the statute as I do. The sole object of the Act is to change the common law liability of common carriers by ship or vessel. Congress has power to regulate such liability on the ocean, but has it power to do it within a State? If it has, may it not also regulate the liability of common carriers by land, as well as by water? Is there anything in the Constitution of the United States, giving it power in one case, and not in the other? Within the States, Congress has no power to legislate on any subject whatever, except so far as it is given by the Constitution in express terms, or by necessary implication. The case is different in regard to the ocean—the common property and highway of nations. There, Congress may legislate on all subjects, touching the property and rights of our citizens, that any nation can, unless expressly prohibited by the Constitution. On the ocean, the citizen and his property are under the sole protection of the Federal Government and its laws. He is no longer within the limits of the State of his nativity or adoption, or within reach of its sovereign power and protection. There, and there only, is he under the sole and exclusive protection of the Constitution and laws of the United States. When on the ocean, in pursuit of gain, health, or pleasure, the Federal Government is vested with plenary power for his protection, and it is with national pride he feels and knows his rights, while he is there, are guarantied to him, not by the sovereign power of a single State, but by the combined sovereignty of all the States. But if Congress has power by statute to fix the liability of common carriers by ship or vessel within a State, it must be under that clause of the Constitution which authorizes it "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." I know of no other clause under which it can be claimed, and it seems almost absurd to refer to this clause as giving it.

To regulate commerce "among the several States" does

not mean to regulate commerce *within a State or within the several States*, but to regulate the exchange or interchange of commodities between States. Common carriers may be said to be aids to commerce, or a means of carrying it on. So are bills of exchange and promissory notes, and contracts of every description, where we use the word in its broadest acceptation as meaning intercourse between individuals, and do not confine it to the exchange of commodities. And when used in this sense, in which it seems to be used in the Constitution, it must still be understood in that instrument as referring to the exchange of commodities between States, and not between the citizens of a State. Any other construction, it seems to me, would open a door to general legislation by Congress on almost every subject within the States, which, if craftily used (and who can 'guard against power), would, in process of time, annihilate State sovereignty, and bring about a consolidation of all power in the General Government.

The Act does not purport to regulate commerce between the States. But let us suppose that to be its object, and concede for a moment Congress has power, in the regulation of such commerce, to legislate on the liability of common carriers by water between Michigan and Ohio, and to say to such carriers, You shall no longer be subject to the laws of Michigan and Ohio as common carriers, though while pursuing your occupation you are never out of their jurisdiction. Would it be contended, Congress has the same power over the liability of carriers confined to the waters of Michigan? If not, is it reasonable to suppose it intended by the Act in question to create a difference in the liability of the owners of ships and vessels navigating our lakes? Why should not the owner of a vessel sailing between Toledo and Monroe, or from the latter place to Cleveland, not be liable to the same extent as the owner of a vessel sailing from Monroe to Ontonagon, or from the latter place to St. Joseph?

Will it be claimed under the admiralty and maritime

jurisdiction given in the Constitution to the federal courts? Can Congress under this grant of power, enact laws declaring what shall and what shall not be the liability of our own citizens, navigating our own waters? If so, about one-quarter of the State of Michigan, which is covered with water, is virtually withdrawn from her jurisdiction, and made subject to the uncontrolled legislation of Congress. Rather than acknowledge such an encroachment on her sovereignty, it would be better for the State to define anew her territorial limits, excluding therefrom that portion of her territory which can no longer be retained without constantly reminding her of her political degradation, and the loss of her sovereignty over her own waters. I can not suppose Congress intended any such thing, and am therefore of opinion the exception in the Act, of vessels "used in rivers or inland navigation," was intended to include vessels navigating our lakes. With this exception, I concur in the opinion of my brother Campbell, and am of opinion the judgment of the Court below should be reversed and a new trial granted.

*Judgment reversed, and new trial granted.*